370 A.2d 366

**Dolores I. REMPEL, Appellee,**

**v.**

**NATIONWIDE LIFE INSURANCE COMPANY, INC.
and Reid W. McGibbeny, Appellants.**

Supreme Court of Pennsylvania.

Argued March 13, 1975.

Decided Feb. 28, 1977.

Charles H. Alpern, Weis & Weis, Pittsburgh, for appellants.

M. J. Seymour, Pittsburgh, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, POME-ROY, NIX, and MANDERINO, JJ.

## OPINION

MANDERINO, Justice.

In April, 1961, appellee's husband, Harry Rempel, purchased a thirty-year mortgage protection policy from appellant, Nationwide Life Insurance Company, Inc., through Nationwide's agent, appellant, Reid W. McGibbeny. The policy was designed to pay to the beneficiary, appellee, Dolores I. Rempel, an amount approximately equal to the outstanding mortgage balance, if any, on the Rempel home when the insured, appellee's husband, Harry Rempel, died. In July, 1961, appellee Rempel, upon instructions from her husband, again contacted McGibbeny and asked whether Nationwide could match a policy offered by a competing insurance company that would provide the same mortgage protection plus an additional $5,000 of life insurance, for only a few dollars a month in increased cost. McGibbeny, after consulting Nationwide, told the Rempels that a $5,000 whole life policy with a twenty-year family income rider would provide the protection sought for only a few dollars per month more than the cost of the original policy.

After a discussion in the Rempel home, an application form was signed by the insured Harry Rempel, in the presence of appellee and McGibbeny. Subsequently, a new policy was issued by Nationwide and sent to McGibbeny. McGibbeny personally delivered the policy to the Rempels but did not discuss or explain the policy to them. A premium of $16.75 per month was paid until the insured's death in 1970. At that time, appellee called McGibbeny, who went to her residence and told her she had a "good policy" that would pay her approximately $16,000. Since the outstanding mortgage was $11,100 at the time of Mr. Rempel's death, the $16,000 figure

matched Mrs. Rempel's expectation of receiving $5,000 in addition to having the mortgage balance paid off. A few days later, however, McGibbeny telephoned appellee and advised her that the policy would pay only a lump sum of $10,430.

Appellee filed an action in trespass against McGibbeny and Nationwide to recover the amount of the mortgage $11,100, and an additional $5,000. In the trespass action appellee contended that Nationwide's agent, McGibbeny, had either negligently or fraudulently misrepresented that the insurance coverage applied for and the policy received would provide for the payment of any outstanding mortgage balance on the Rempel home, if any, at the time of the insured's death, plus an additional $5,000 of life insurance. The trial court, with the consent of appellants and appellee, directed a verdict in favor of appellee for $10,430, the amount which Nationwide admitted owing, plus interest of 6% per annum. The trial court denied appellants' motion that the jury be instructed to return a verdict in their favor on the remaining portion of appellee's claim, but did withdraw the issue of fraudulent misrepresentation from the jury. Only the issue of negligent misrepresentation was submitted for the jury's consideration. The jury found in favor of appellee in the sum of $5,670 plus 6% interest per annum. Appellants' motion for judgment not withstanding the verdict was subsequently denied and judgment was entered on the verdict. *Rempel v. Nationwide Life Insurance Co., Inc.,* 227 Pa.Super. 87, 323 A.2d 193 (1974). We granted appellants' petition for allowance of appeal, hence this appeal followed.

Appellants first contend that the trial court erred in "not granting [their] motion for binding instructions" arguing that appellee failed to establish a case of negligent misrepresentation.

The elements of the tort of negligent misrepresentations are stated in Section 552 of Restatement of Torts:

"One who in the course of his business or profession supplied information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon the information if

(a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and

(b) the harm is suffered

(i) by the person or one of the class of persons for whose guidance the information was supplied, and

(ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith."

Appellants argue that binding instructions in their favor should have been given to the jury because McGibbeny made no misrepresentations to the Rempels, and even if he did, reliance by the Rempels on the misrepresentations was not justified. As to whether McGibbeny made any misrepresentations, the evidence was conflicting. McGibbeny testified that he did not misrepresent the contents of the application or the policy. Appellee Rempel, however, testified that McGibbeny stated that the coverage provided by the policy would pay off the mortgage balance plus pay an additional $5,000. Because of this conflict, a jury issue was presented. Under these circumstances, binding instructions, based on a claimed lack of evidence of misrepresentation, would have been improper. In a jury trial, the resolution of a factual dispute must be made by the jury—not the trial judge.

Appellants also contend that binding instructions should have been given because the evidence did not es-

tablish that the Rempels *justifiably* relied on the negligent misrepresentation of appellant McGibbeny. There can be no question that the evidence established that for over ten years the Rempels *relied* on the representations of McGibbeny that the second policy contained the same mortgage protection coverage as the first policy, plus an additional $5,000 of insurance. Appellee Rempel testified that the policy was never read by her or her husband and its terms were not explained by McGibbeny when the policy was delivered. The only issue presented is whether the jury could have properly concluded from the evidence that the reliance by the Rempels was *justifiable*.

The issue of the justification of the Rempels' reliance cannot be considered in a vacuum. Neither this Court nor a jury can consider the issue without considering the relationship of the parties involved and the nature of the transaction. Consumers, such as the Rempels, view an insurance agent such as McGibbeny, as one possessing expertise in a complicated subject. It is therefore not unreasonable for consumers to rely on the representations of the expert rather than on the contents of the insurance policy itself. Indeed, the procedure established by Nationwide is one which leaves the consumer little choice but to rely on the representations of the expert— the insurance agent. The insurance application signed by the insured states that the application is an offer which must be accepted by the company, yet the application does not contain in detail the exact terms of the offer being made. Rather, a "specialized language" is used which will have no meaning to the consumer except the meaning attributed to the words by the representations of the agent. In this case the offer made said:

> "In consideration of reissuing my policy on the whole life plan of insurance for the face amount of $5,000 with the twenty year family income rider, effective April 5, 1961, the following statements are made by me . . ."

No other statements appeared in the offer to explain what was meant by this "specialized language." The Rempels, of necessity, relied on McGibbeny's "translation" of the meaning of the offer. This is the only document which the insured was required to sign; the consumer's signature is not required on the policy. In fact, it is received weeks, or perhaps longer, after the signing of the application. The significant decision by the consumer is not made when the policy is received. The receipt of the policy is the acceptance of the offer previously made. It is at the time that the offer is being made by the consumer—when the application is being signed —that the consumer is making the decision to "buy" or "not to buy" the insurance. By the time the written policy is received, it has lost its importance to the insured. Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv.L.Rev. 961, 968 (1970). It is not unreasonable, therefore, for a purchaser of insurance to "pass" when the time comes to read the policy.

When the Rempels received the policy at issue here, they were not required by Nationwide to sign the policy, and the policy was not explained to them by McGibbeny. Moreover, there is nothing on the face of the policy which would have alerted them that the policy did not contain the coverage expected as a result of the application made with McGibbeny's explanation of what the offer meant. In fact, nothing in the main portion of the policy in this case indicated that the coverage was anything other than what had been applied for. Only by examining a rider attached to the policy, and making mathematical computations could one ascertain the extent of the coverage provided.

The idea that people do not read or are under no duty to read a written insurance policy is not novel. *Dowling v. Merchants Ins. Co.*, 168 Pa. 234, 239–40, 31 A. 1087,

1087 (1895), in discussing the insured's acceptance of the policy as written, states:

"The [insurance company] cannot be released from its contract because [the insured] acting in good faith accepted without examination the policy written by the agent. In *Swan v. Watertown Ins. Co.*, 96 Pa. 37 [(1880)], the insured signed an application which had not been finished. He directed another to fill it up, and expressed doubt as to the manner in which it should be done. It was held that *he knew facts to incite him to read the policy*, and was charged with knowledge of its contents, and should under the circumstances, be presumed to have accepted it as written. No such presumption arose in this case." (Emphasis added.)

In *Rathblott v. Royal Indemnity Co.*, 310 Pa. 37, 40–41, 164 A. 718, 719 (1933) it was stated:

"*Nothing in the record would justify the conclusion that plaintiff was not entitled to accept his policy in the belief that defendant had prepared it in accordance with the understanding of both.* 'The defendant cannot be released, from its contract because the plaintiff, acting in good faith, accepted without examination the policy written by its agent.' *Dowling v. Merchants' Ins. Co.*, 168 Pa. 234, 239, 31 A. 1087 . . . ." (Emphasis added.)

The point made by these cases and by Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv. L.Rev. 961, 968 (1970) is that the policyholder has no duty to read the policy unless under the circumstances it is unreasonable not to read it.

There is no evidence in the record indicating that the Rempels knew, or should have known, that the policy which they received did not contain the provisions which McGibbeny led them to believe would be in the policy. Under these circumstances, the evidence was sufficient

to present to the jury for their determination the question of whether the Rempels justifiably relied on the representations of McGibbeny that the policy contained the coverage requested.

The appellants argue that if the evidence in this case is sufficient to support a finding of justifiable reliance by the Rempels, the door will be open to fraudulent claims in many insurance situations. Initially, we do not share the cynicism of the appellants. Fraudulent claims are possible in many areas of the law, but such a possibility is not reason for denying meritorious claims, particularly when procedures other than those utilized in this case are open to the insurance company. The application form, which is the offer being made by the consumer, could be prepared in large type *in terms easily understood by the insured* so that reliance on the agent's representations would not be necessary. The insurance company might adopt a practice whereby an insured is required to sign the policy and acknowledge the receipt of a clear and comprehensible notice of at least the main coverage provided either as contained in the policy document or separately. These examples only serve to illustrate why we are not persuaded that the insurance company is helpless to avoid or severely limit the possibility of fraudulent claims. We have very little sympathy for Nationwide's alleged concerns in view of the fact that its procedures necessitate reliance by a consumer on the representations of the insurance agent.

Appellants next argue that the testimony of appellee Rempel should have been barred by the parol evidence rule, even though this action is one in trespass for negligent misrepresentations rather than in assumpsit for breach of contract. This issue was raised but not decided in *Taylor v. Crowe,* 444 Pa. 471, 282 A.2d 682 (1971).

In a majority of jurisdictions the parol evidence rule bars oral testimony in certain contract cases, but is not applicable in misrepresentation cases.

" . . . The question frequently arises, whether the action for misrepresentation can be maintained when the promise itself cannot be enforced—as where it . . . falls within the parol evidence rule. . . .

One group of cases, undoubtedly in the minority, have held that it cannot, arguing that to allow the action would be to permit an evasion of the particular rule of law which makes the promise unenforceable, or that the promisee must be deemed to know the law, and must be held not to have been deceived by such a promise. The prevailing view, however, permits the action to be maintained, considering that the policy which invalidates the promise is not directed at cases of dishonesty in making it, and that it may still reasonably be relied on even where it cannot be enforced. Obviously the conclusion will depend upon the favor with which the particular rule of law is regarded by the court under the circumstances of the case; but the tendency is clearly to treat the misrepresentation action as a separate matter from contract." Prosser, Law of Torts, 729–730, 4th Ed. 1971.

The Restatement of Agency 2d, § 257, Comment c, follows the majority rule:

"Parol Evidence. Although parol evidence cannot be introduced to vary or contradict the terms of the written contract, it can be introduced for the purpose of proving that the contract was obtained by means of untrue statements . . . "

■ Whether or not the parol evidence rule should be inapplicable in all misrepresentation cases is an issue we need not now decide. In this case appellee sought recovery on the basis of the policy as it should have been written. In reality this was a request for reformation of the policy. When reformation is sought, oral testimony is permitted in misrepresentation cases and in breach of

contract cases. Restatement of Agency 2d, § 259 A provides:

"When a servant or other agent, acting within his agency powers, has made an agreement with a third person and a writing is executed to embody it, if the writing is different from that agreed upon because of the misrepresentation of the agent, the other party is entitled to have it reformed. . . . "

This section of the Restatement of Agency 2d also provides the following illustration:

"1. A, for his principal, P, agrees to sell and T agrees to buy, chattels for which the agent was authorized to give a special warranty if required by the purchaser and which he told T he would give. The writing in fact denies the existence of the warranty. In reliance upon A's statement, T did not read the document. T is entitled to have the document reformed . . . "

Comment a of § 259 A points out that "the rule stated in this section is in accord with that stated in the Restatement of Contracts, § 491. Section 491 of the Restatement of Contracts, like § 259 A of the Restatement of Agency, permits reformation in a contract action based on misrepresentation. That section provides another illustration as follows:

"1. A and B orally agree that A shall sell goods in installments to B, and that B shall pay for them on delivery. B purports to reduce the agreement to writing but inserts in the writing a provision that payment shall be made thirty days after each delivery. A negligently signs the writing without reading it. If there is clear and convincing evidence showing these facts A can have the writing reformed so that it expresses the oral agreement."

In both of the illustrations quoted above, the party seeking to reform the contract is permitted to do so in

spite of the fact that that party did not read the document before signing it. In the case before us, the appellee never even signed the writing in question.

■■■ Whether an action is in trespass or in assumpsit, the parol evidence rule is no bar to oral testimony designed to show that the writing is not an integrated writing. 3 Corbin on Contracts, § 573 (1960), Restatement of Contracts, § 237. If a party contends that a writing is not an accurate expression of the agreement between the parties, and that certain provisions were omitted therefrom, the parol evidence rule does not apply. *See Bardwell v. Willis Co., Inc.*, 375 Pa. 503, 100 A.2d 102 (1953). This is so even if the party seeking to reform the writing negligently signs the writing without reading it. Restatement of Contracts, § 491, Restatement of Agency 2d, § 259 A.

It is clear that, as the result of McGibbeny's negligent misrepresentations, Rempel mistakenly believed that he had obtained more insurance coverage than was actually provided. In suing for the greater amount, his widow was, in effect, seeking to reform the contract of insurance to coincide with her husband's reasonable expectations and beliefs. She sought both to reform the contract and to recover as damages the total sum she was entitled to receive once the contract was reformed. The policy as drafted clearly did not coincide with what the Rempels believed it would contain as a result of conversations with the agent. Appellee Rempel did not attempt to introduce evidence to vary, contradict, or alter the integrated writing—she was, instead, attempting to show that the purported integration was not an integration and did not coincide with what it was previously agreed would be received in return for the premium paid. Corbin discusses a similar occurrence in his Treatise. He there states:

"A provision in an insurance policy made it a condition of the insurer's duty that a clear space of 100 feet

should be maintained between the insured lumber and the mill; and another provision required that any waiver must be in writing endorsed on the policy. The court held that the insured could not, in an action for the amount of a loss, prove that the insurer knew the facts of his lumber yard and waived the 100 foot requirement in advance. *All that the plaintiff needed to do, however, was to allege in his complaint that the policy as drafted was mistaken and to ask for its reformation as well as for a judgment for the amount of the loss. The burden of proving such allegation might be heavy; but it would not always be so."* 3 Corbin on Contracts, § 580, pp. 439–40. (Emphasis added.) *See also Evans v. Marks,* 421 Pa. 146, 218 A.2d 802 (1966).

■ Appellee was thus properly permitted to introduce the parol evidence questioned in this case to establish that the contract omitted provisions which appellants represented to appellee would be contained in the writing. *See Bardwell v. Willis Co., Inc.,* 375 Pa. 503, 100 A.2d 102 (1953). We must therefore reject appellants' contention that the parol evidence should not have been admitted in this case.

We have also examined other issues raised by appellants, including issues concerning the charge to the jury, and find them to be without merit.

Order affirmed.

ROBERTS, J., did not participate in the consideration or decision of this case.

JONES, C. J., and EAGEN and POMEROY, JJ., concur in the result.